Filed 11/24/21  P. v. Sanchez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RIGOBERTO SANCHEZ,<br><br>Defendant and Appellant. | F078259<br><br>(Super. Ct. No. BF168876A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Rigoberto Gomez Sanchez was convicted by jury of premeditated murder (Pen. Code,[1] § 187, subd. (a), count 1); attempted murder (§§ 664/187, subd. (a), count 2); shooting at an inhabited dwelling (§ 246, count 3); assault with a firearm (§ 245, subd. (a)(2), count 4); and residential burglary (§ 460, subd. (a), count 5). The jury also found true enhancements alleging Sanchez personally used a firearm (§ 12022.5, subd. (a)), he personally discharged a firearm (§ 12022.53, subd. (c)), and that he personally discharged a firearm causing death (§ 12022.53, subd. (d)). Sanchez was sentenced to an indeterminate prison term of 50 years to life, plus a determinate term of 30 years four months.

Sanchez raises the following claims on appeal: (1) the prosecutor committed error in closing argument by stating the defense attorney had repeatedly lied; (2) the trial court erred in taking judicial notice of the date and time of Sanchez's arrest and booking; (3) the trial court violated Sanchez's right to due process when it permitted testimony to be readback to the jury in his absence; (4) the trial court erred by denying defense counsel's request for a continuance to file a *Pitchess*[2] motion during trial; and (5) the cumulative effect of these errors necessitates reversal of Sanchez's conviction. We affirm.

# PROCEDURAL HISTORY

On September 19, 2017, the Kern County District Attorney's Office filed an information charging Sanchez with premeditated murder (§ 187, subd. (a), count 1); attempted murder (§§ 664/187, subd. (a), count 2); shooting at an inhabited dwelling (§ 246, count 3); assault with a firearm (§ 245, subd. (a)(2), count 4); and residential burglary (§ 460, subd. (a), count 5). The information further alleged Sanchez personally

---

[1]    All further undefined statutory citations are to the Penal Code unless otherwise indicated.

[2]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

used a firearm (§ 12022.5, subd. (a)) in the commission of count 4, he personally discharged a firearm (§ 12022.53, subd. (c)) in the commission of count 2, the attempted murder alleged in count 2 was premeditated (§ 664, subd. (a)), and Sanchez personally discharged a firearm causing death (§ 12022.53, subd. (d)) in relation to counts 1 and 3.

On July 25, 2018, Sanchez's jury trial commenced.

On September 14, 2018, the jury reached a verdict, two days after they had begun deliberations. Sanchez was found guilty as charged with the exception of the allegation that the attempted murder was premeditated.

On September 17, 2018, Sanchez filed a motion for new trial.

On October 17, 2018, Sanchez's motion was denied. He was sentenced to a prison term of 50 years to life plus a determinate term of 30 years four months.

On October 17, 2018, Sanchez filed a timely notice of appeal.

## STATEMENT OF FACTS

*Prosecution's Case*

Rigoberto Sanchez and Sandra Sanchez were married in 2003.[3] Sandra had two children from previous relationships, Johnny and Marissa. Rigoberto raised Johnny and Marissa as if they were his own children. Rigoberto and Sandra also had one child together, a daughter, who died from a birth defect. After their child died, the marriage became strained.

Rigoberto blamed Sandra for their daughter's death. Sandra was upset by Rigoberto's gratuitous dishonesty. The couple separated briefly in 2012 but later reconciled. In October 2016, Rigoberto moved out of the couple's home at Sandra's request. Sandra moved into an apartment with her son Johnny, while Marissa and Rigoberto moved back into the family home.

---

[3]    We refer to Rigoberto Sanchez and Sandra Sanchez by their first names in this statement of facts because they share the same last name. No disrespect is intended. We refer to appellant by his last name throughout all other portions of this opinion.

Rigoberto was having difficulty coping with the end of the marriage. In December of 2016, he called Sandra hoping to reconcile. Around this time, Sandra began dating Edwin Lima, a married correctional officer who worked at Tehachapi State Prison. Rigoberto and Sandra were also both employed as correctional officers at Tehachapi State Prison. Rigoberto told Sandra, " '[she] better not be dating anybody from work and make [him] look bad,' " and he was " 'not going to see [her] happy with any other [man], especially someone from work.' "

On March 9, 2017, Sandra was at work when she received a notification on her phone that someone was near her front door. She had installed a Ring doorbell camera a few days prior because she suspected Rigoberto had entered her apartment while she was not home. When Sandra checked her phone, she saw video of Rigoberto approaching her apartment.

Rigoberto used a key to access the apartment. Using the Ring application, Sandra asked Rigoberto, " 'What are you doing? You're breaking into my apartment. I'm going to call the cops.' " Rigoberto replied, " 'I'm looking for proof.' " He did not elaborate.

Sandra reported the incident to Rigoberto's immediate supervisor at the prison, Lieutenant Madden. She wanted the incident handled informally so that Rigoberto's job would not be jeopardized. Upon her request, Rigoberto filed a petition for separation. Sandra changed the locks on her door and ceased all communication with Rigoberto.

On May 25, 2017, Sandra and Lima left for a four-day cruise. During the trip, Sandra checked her Ring doorbell video application and saw a man walking toward her doorbell with a hammer. The man, later identified as Ross Stovall, appeared to be a transient. Stovall removed the Ring doorbell with the hammer, but the doorbell kept recording. Rigoberto was also depicted in the recording. When Johnny returned home, he called Sandra to tell her that someone had broken into their apartment.

On May 28, 2017, when Sandra returned from her cruise, she noticed items missing from her apartment, including her gun. She called the police to report the burglary.

A police officer with the Bakersfield Police Department called Rigoberto's home phone and cell phone over a dozen times and surveilled Rigoberto's pickup truck, which remained parked outside of Rigoberto's home. Johnny told Rigoberto that " 'They had [him] on camera breaking into the apartment.' "

Sometime after the police left her apartment, Rigoberto called Sandra from an unknown telephone number. He began yelling at Sandra and questioned her about the cruise that she had taken with Lima. Sandra hung up the phone.

At approximately 7:00 p.m., Rigoberto called again. This time, Lima took the phone from Sandra and a 40-minute argument ensued between Lima and Rigoberto. Sandra and Johnny both heard Rigoberto yelling at Lima over the phone. Lima responded calmly.

At approximately 8:00 p.m. that evening, Rigoberto told his son Johnny that he was leaving town. Rigoberto was crying. He told Johnny the police were looking for him, he was afraid of losing his job, and that he had to flee. Rigoberto was driving Marissa's car, which was uncharacteristic for him to do. He gave Johnny money and his ATM card and personal identification number.

Between 9:00 and 9:30 p.m., Marissa called Rigoberto and told him she had seen Lima at Sandra's apartment. Around this same time, Rigoberto called Johnny and told him to spend the night at Marissa's house.

At 10:00 p.m., Rigoberto visited his sister and gave her a framed photograph of his dog. Rigoberto was acting strange and his sister thought he was going to commit suicide. A handwritten will was inscribed on the back of the photograph.

At 10:13 p.m., Rigoberto called Sandra a third time. After a brief conversation, Sandra hung up the phone.

At approximately 10:15 p.m., Rigoberto called Johnny and asked him if Sandra and Lima were home. He told Johnny he recognized Lima's vehicle in the parking lot of Sandra's apartment complex. Johnny lied and told Rigoberto that Lima and Sandra were not home.

At approximately 10:40 p.m. that evening, Lima sat on Sandra's bed attempting to setup a second Ring doorbell camera that he had purchased. Suddenly, gunshots erupted.

Sandra rolled off the bed and began crawling toward her son's room, telling him to " 'Get down, get down.' " Sandra yelled, " 'Get the gun.' " A second volley of shots erupted. Sandra managed to call 911. Immediately after the shooting stopped, she heard knocking at her front door. Believing that the shooter was at her front door, Sandra crawled back into her bedroom to retrieve Lima's gun from his holster. She found Lima unresponsive.

Lima had been shot more than 20 times, including in the head and in the back. A pathologist subsequently determined that at least 15 to 20 shots occurred while Lima was laying on the ground. According to Sandra, Lima did not pull out his gun prior to the shooting.

Sandra racked a round from the gun, ejecting the bullet from the chamber so that it could not be fired. Neighbors standing outside her window assured her that the shooter had fled and that help was at the front door. Sandra put Lima's gun down.

None of Sandra's neighbors reported hearing arguing or yelling prior to the shooting.

*The Arrest*

Detective Littlefield from the Bakersfield Police Department used a license plate reader system to locate Marissa's car. He determined that on May 28, 2017, the vehicle was observed on the freeway headed towards Mexico.

6.

Several weeks after the shooting, Mexican authorities located Rigoberto in Mexico and deported him to Arizona. Rigoberto had grown out his facial hair and wore "tattoo sleeves" to disguise himself.

### Police Interrogation

Detective Littlefield and his partner, Detective Davis, interrogated Rigoberto in Arizona. During the interrogation, Rigoberto admitted that he had made a copy of Johnny's key to Sandra's apartment and that he had previously used the key to access Sandra's apartment.

Rigoberto told detectives that he believed Sanchez was cheating on him with Lima, whom he described as a "dirty cop." On the night of the shooting, Rigoberto challenged Lima to a fight while they were arguing on the phone. According to Rigoberto, Lima never threatened him during the conversation. Rigoberto stated that he walked up to Sanchez's bedroom window with a gun in his hand, but he did not remember how many shots he fired into Sandra's bedroom, where he was aiming, or whether anyone had fired back at him.

On June 29, 2017, Rigoberto was interrogated at the Bakersfield Police Department by Detective Littlefield and Detective Davis. Rigoberto claimed he snapped after Lima told him, "I'm [sleeping with] your wife." He decided he was not going to put up with the situation any longer.

Rigoberto acknowledged he had an anger problem and stated he would often get tunnel vision. On the night of the shooting, he gripped his gun so hard it left marks that had not healed 30 days later. Rigoberto did not remember walking up to Sandra's window or throwing something through the window. He claimed he did not remember seeing anyone in the apartment.

### Defense's Case

Rigoberto waived his Fifth Amendment right and testified at trial. He knew Sandra was dating someone as early as October 2016 because he began searching her cell

7.

phone records. Rigoberto claimed he decided not to reconcile with Sandra when he discovered she went away with Lima for New Year's Eve.

Rigoberto stated Lima had called him three days prior to the shooting and had thanked him for paying for the cruise Lima and Sandra were about to take. Rigoberto also claimed Lima threatened to assault Rigoberto's younger brother, Gerardo, who is also a correctional officer at Tehachapi State Prison. Rigoberto stated he reported the threat to his supervisors. They told Rigoberto that there was "no proof" to support his claim, and they alleged he had fabricated the threat. On cross-examination, he specified he had reported the threat to Sergeant Clayton.

Rigoberto claimed Lima was a "dirty cop," but he did not have any evidence to support his opinion. He never liked Lima. In February 2017, Rigoberto admitted to sending his son into Sandra's room to look for photographs of Lima and Sandra together. He wanted to send the photographs to Lima's wife.

Rigoberto admitted to breaking into Sandra's apartment on two prior occasions. He paid Stovall $80 and two cheeseburgers to remove the Ring doorbell on Sandra's apartment door for him. Rigoberto denied Stovall's claim that Rigoberto had offered him $5,000 to burn down Sandra's apartment.

On the day of the shooting, Lima called Rigoberto on Sandra's phone and an argument ensued. Lima continued to taunt Rigoberto. He challenged Rigoberto to a physical fight, prompting Rigoberto to go over to Sandra's apartment. Rigoberto borrowed his daughter's Corolla and drove over to Sandra's apartment. He had a loaded Glock .22-millimeter firearm with a 15-round magazine, and a spare 15-round magazine.

That evening, Rigoberto had already decided to leave town and he had his bags packed. He was told there was a warrant out for his arrest for breaking into Sandra's apartment.

Rigoberto claimed that when he arrived at Sandra's apartment, he confronted Lima when he saw Lima standing outside. In response, Lima ran back inside Sandra's

apartment. As Rigoberto walked back towards his car, he saw Lima looking out of Sandra's bedroom window. Lima yelled a disparaging remark about Rigoberto's daughter.

Angry, Rigoberto picked up a cinderblock and threw it through Sandra's window. When he saw Lima reaching for his gun, Rigoberto pulled his own gun and began firing in Lima's direction.

When the gun slide locked up, Rigoberto dropped the magazine and reloaded. Suddenly, Sandra came running out of the room, swung the door open, and pointed a gun at Rigoberto. He fired the gun at Sandra in self-defense. Rigoberto claimed that every shot he fired was in self-defense.

After the shooting, Rigoberto panicked, got into his car, and drove with no destination in mind. He tossed his cell phone out the window and his gun down a storm drain. Using his uncle's truck, he crossed the border into Mexico. He was subsequently arrested by Mexican authorities and was deported back to the United States.

When he was taken into custody, he had two interviews with police, one in Arizona and one in Bakersfield. During the first and second interviews, Rigoberto withheld information from the police. Rigoberto claimed he was interrogated a third time by Detective Littlefield and Detective Davis at the Bakersfield Police Department. During this interview, he claimed he told the detectives that he had acted in fear for his life.

### The Prosecution's Rebuttal Witnesses

#### Sergeant Clayton

Sergeant Clayton, a correctional sergeant at Tehachapi State Prison, testified that Rigoberto never reported any threats to him concerning Rigoberto's brother. Sergeant Clayton was transferred from the Investigative Services Unit during the first week of May 2017, before Rigoberto claimed he reported Lima's threat.

**Detective Littlefield & Detective Davis**

According to Detective Littlefield, after Rigoberto was interrogated in Bakersfield, he was moved into a holding cell to eat and to await transport to the county jail. Both Detective Littlefield and Detective Davis testified that Rigoberto was not interrogated a third time while in the holding cell. Detective Littlefield submitted an electronic arrest card for Rigoberto at 10:28 p.m. The detectives then transported Rigoberto to the central receiving facility at the county jail where he was booked at 11:07 p.m.

*The Defense's Surrebuttal*

Rigoberto maintained that Sergeant Clayton was not telling the truth, and that he had reported Lima's threat to Sergeant Clayton. Rigoberto further claimed, contrary to the testimony of Detective Davis and Detective Littlefield, that a third unrecorded interrogation occurred at the Bakersfield Police Department.

## DISCUSSION

### I. Sanchez's Claim of Prosecutorial Error Lacks Merit

Sanchez contends the prosecutor committed prejudicial error during her closing argument by accusing defense counsel of repeatedly lying to the jury, and by subtly but forcefully intimidating any potential holdout jurors. We find no evidence of prosecutorial error upon this record.

#### A. Background

During her argument in rebuttal, the prosecutor made the following statements:

> "[PROSECUTOR]:       I'll agree with one thing that counsel said, and that's that Mr. Sanchez is stupid. What he did that night was stupid. And it was a series of stupid mistakes and stupid decisions. He did put himself in this situation. No one else did. Not Detective Littlefield. Not me. Not Ross Stovall. Not Sandra Sanchez. He is the one who started this entire chain of events that happened over months, and months, and months, and culminated in the murder of Edwin Lima. There's some studies that show that the more you repeat something, the

10.

louder you say it, some people may start to believe it. And that's why [defense counsel] talked for three hours at a very high volume and repeated the same lies over, and over, and over, hoping one or two –

"[DEFENSE COUNSEL]: Objection, your Honor.
Objection. That would be improper. Defense would have a motion.

"[PROSECUTOR]: I'm sorry, Judge, for – after the things he called me?

"THE COURT: Counsel, look, both of you. Civility governs. This is a search for the truth. No personal defaming comments. [¶] Disregard any of those comments, ladies and gentlemen. You're respectful job is to decide the case solely and only on the evidence and the law."

After further discussion, the prosecutor continued:

"[PROSECUTOR]: You repeat the same lie over, and over, and you hope -

"[DEFENSE COUNSEL]: I'll object again, your Honor."

The trial court asked the prosecutor to restate her argument. The prosecutor made the following comments, in relevant part:

"[PROSECUTOR]: And you all were chosen for a reason. You all have common sense and life experience and the ability to decide who's telling the truth and who's not. Who has an interest in the outcome of this case? Who is willing to get up there and lie to you yet again? It's [Sanchez].

If I had met with Dr. Carpenter and showed him the photo, or met with Detective Pair and showed him or spoke to him about something, then counsel's going to be up here saying, '[the prosecutor] rehearsed the whole trial.'

"[DEFENSE COUNSEL]: Objection. That's improper. Defense has another motion.

"THE COURT: Ladies and gentlemen, you're to judge the case solely on the evidence and the law, and any dispersions that

11.

counsel may cast towards either side, disregard that. What the attorneys say is not evidence. You are the sole judges of the evidence and the law."

Following the parties' closing arguments and outside the presence of the jury, the trial court returned to defense counsel's objections. Defense counsel moved for a mistrial, insisting the prosecutor had called him a liar and that he had interrupted her to prevent her from "doing more damage when she said she hopes one or two of you will bite." According to defense counsel, the prosecutor's second statement was analogous to comments made by the prosecutor in *Sanchez*.[4] The trial court observed that in *Sanchez*, the appellate court found prosecutorial error where the prosecutor had stated, "the jury would need to be gullible, naïve, and hoodwinked to believe defendant, who would then go home and laugh at their expense." (*Sanchez*, *supra*, 228 Cal.App.4th at p. 1534.)

Defense counsel acknowledged the trial court had instructed the jury to disregard the prosecutor's statements concerning "telling lies," but he insisted the statement amounted to prosecutorial misconduct. The prosecutor replied that she was "allowed to comment on Mr. Sanchez's repeated lies to this jury." The trial court stated that it had not interpreted the prosecutor's statement as a suggestion that defense counsel was repeatedly lying.

Following a readback of the prosecutor's statements, the trial court found no error. The trial court concluded the prosecutor's statements were a fair comment on the evidence.

Defense counsel declined to have the trial court provide an additional curative instruction to address either asserted error because he did not want to call attention to the errors. Defense counsel acknowledged that the trial court had twice admonished the jury.

---

**4** *People v. Sanchez* (2014) 228 Cal.App.4th 1517 (*Sanchez*).

## B.	Relevant Legal Principles

"It is misconduct for the prosecutor in argument to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense." (*People v. Cash* (2002) 28 Cal.4th 703, 732; *People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Bain* (1971) 5 Cal.3d 839, 847.) To that end, it is improper for the prosecutor to characterize defense counsel as a liar or to accuse defense counsel as lying to the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193.)

Although a prosecutor is not permitted to make denigrating remarks about defense counsel, " 'harsh and colorful attacks on the credibility of opposing witnesses … are permissible.' " (*People v. Pearson* (2013) 56 Cal.4th 393.) " 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence … [and] to argue on the basis of inference from the evidence that a defense is fabricated.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

"In evaluating whether prosecutorial error is prejudicial, the standard for prejudice depends on whether the error violates the federal Constitution or the California Constitution; if it is the former, the error mandates reversal unless it is ' " 'harmless beyond a reasonable doubt' " '; if it is the latter, the error mandates reversal 'if there [is] a "reasonable likelihood of a more favorable verdict in the absence of the challenged conduct." ' " (*People v. Collins* (2021) 65 Cal.App.5th 333, 342.)

## C. Waiver

The parties do not address the issue of waiver. Defense counsel declined a curative admonition by the trial court claiming he did not want to highlight the prosecutor's challenged statements to the jury. The failure to request a curative admonition may result in waiver of prosecutorial error on appeal. (*People v. Prieto* (2003) 30 Cal.4th 226, 259, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841, 864 ["As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."]; *People v. Friend* (2009) 47 Cal.4th 1, 29, quoting *People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 ["[o]nly if an admonition would not have cured the harm is the claim of misconduct preserved for review"].)

Under the circumstances present here, we conclude Sanchez's claim of prosecutorial error is waived on appeal. Although we are mindful of the fact that an admonition may not cure every type of harm caused by prosecutorial misconduct (*People v. Hill* (1998) 17 Cal.4th 800, 820), we see no reason why that would apply here. In our view, any asserted error has been waived. Nevertheless, to the extent it is argued that a requested admonition would not cure alleged harm, we will address the merits of Sanchez's claim.

## D. Analysis

Assuming Sanchez's claim of prosecutorial error had been preserved for appeal, the record shows neither error nor prejudice assuming error. The record does not support Sanchez's assertion that the prosecutor stated defense counsel had lied repeatedly. Further, we reject Sanchez's assertion that the prosecutor's statement—"hoping one or two of you …"—is analogous to the prosecutor's statements challenged in *Sanchez*. We address both statements, in turn, below.

### 1. The Prosecutor Did Not Suggest Defense Counsel Was Dishonest

The record supports the conclusion that the prosecutor's comments referred to the fact that defense counsel was repeating lies told by Sanchez during his testimony. Taken in isolation, the prosecutor's comments may perhaps support the inference that the prosecutor was implying that defense counsel was lying. However, considering the prosecutor's comments in the context of the overall argument, as we must (*People v. Centeno, supra,* 60 Cal.4th at p. 667), the prosecutor was plainly arguing Sanchez was lying, and defense counsel was repeating Sanchez's lies "over, and over, and over."

The common thread woven through the prosecutor's case was that Sanchez was "lying to literally everyone in this case." During argument, the prosecutor stated Sanchez is "an admitted liar. Over, and over, and over, and over again." Point-by-point, she provided specific examples where Sanchez's testimony was contradicted by the testimony of other witnesses, and by his own prior statements. Thus, when the prosecutor stated that defense counsel had "talked for three hours at a very high volume and repeated the same lies *over, and over, and over*," she was plainly referring to the fact that defense counsel was repeating lies told by Sanchez.

Although Sanchez invites us to conclude the jury drew the most damaging inference possible from the prosecutor's comments, we decline to do so. (*People v. Centeno, supra,* 60 Cal.4th at p. 667 [" 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "].) The record does not support Sanchez's assertion that the prosecutor had maligned defense counsel.

Even assuming the jury interpreted the prosecutor's comments as an attack on defense counsel's honesty and veracity, Sanchez has not met his burden of establishing prejudice. During the course of the prosecutor's closing argument, the jury was twice admonished to judge the case solely upon the evidence presented and the law, and not upon any aspersions cast by the attorneys. The trial court's admonition was reinforced

15.

when it subsequently instructed the jury that "[n]othing that attorneys say is evidence[,]" including their remarks during opening and closing statements. As nothing upon this record suggests otherwise, we presume the jury followed the trial court's instruction, "and that any error was cured." (See *People v. Dickey* (2005) 35 Cal.4th 884, 914.)

### 2.    *The Prosecutor Did Not Attempt to Intimidate Holdout Jurors*

Relying upon *People v. Sanchez, supra,* 228 Cal.App.4th at pages 1529 through 1530, Sanchez further contends the prosecutor attempted to intimidate any potential holdout jurors by suggesting they would have to be gullible to believe Sanchez's defense. The prosecutor specifically stated, "You repeat the same lie over, and over, and you hope [¶] … [¶] hope that one or two of you…."

In *Sanchez,* the prosecutor argued the "defendant hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' " (*Sanchez*, *supra*, 228 Cal.App.4th at p. 1529.) The appellate court concluded, "The prosecutor's comments fell outside the bounds of the 'wide latitude' given to prosecutors during argument because the comments were designed to offend and intimidate the potential holdout juror who doubted defendant's guilt." (*Id.* at p. 1530.) According to the court, the prosecutor's comments could have a "chilling effect on the jury's deliberative process." (*Id*. at p. 1534.)

We reject Sanchez's assertion that the prosecutor's challenged comments here denigrated any potential holdout jurors. The challenged comments here are not remotely similar to the prosecutor's statements in *Sanchez*. While the prosecutor did imply Sanchez was hoping one or two of the jurors would find his testimony credible, she did not suggest they would be gullible in so doing. We find no error, and for the reasons discussed above, no prejudice assuming error.

**II.    The Trial Court Did Not Abuse its Discretion by Taking Judicial Notice of the Date and Time of Sanchez's Arrest and Booking**

Sanchez contends the trial court erred by taking judicial notice of the date and time of his arrest and booking noted on a certified California Justice Information Services (CJIS) printout. According to Sanchez, the trial court's error was prejudicial under any standard as the admission of this evidence undermined his credibility, which was pivotal to his claim of self-defense. We find his assertions unpersuasive.

**A.    Background**

At trial, Sanchez claimed that he fired every shot in self-defense. Following his arrest, he was interrogated twice. The first interrogation occurred in Arizona after he was extradited to the United States, and the second occurred in Bakersfield. Sanchez testified he was interrogated a third time, and during this interrogation, he told detectives he had acted in fear for his life. According to Sanchez, the third interrogation occurred at the Bakersfield Police Department before he was transported to the county jail, and the interrogation lasted 30 minutes to one hour.

In rebuttal, the prosecutor called Detective Littlefield and Detective Davis, who both testified that a third interrogation had never occurred. The prosecutor asked Detective Littlefield what time he completed Sanchez's arrest card. Detective Littlefield replied, "It was shortly after 10:00 p.m. I don't remember the exact time offhand." The prosecutor asked if the arrest card was submitted at 10:28 p.m., to which Detective Littlefield replied, "[s]ounds correct." Detective Littlefield further explained that the sheriff's department's booking system attaches an electronic signature, date, and timestamp when an officer submits an electronic arrest card, which is maintained in an automated system called "the Arietis System."

The prosecutor asked Detective Littlefield whether he knew the exact time that he submitted Sanchez's arrest card. Detective Littlefield replied, "No, not offhand. It was

17.

before 10:30 p.m." The prosecutor asked whether it would refresh Detective Littlefield's memory to look at the arrest card. Defense counsel objected pursuant to *Melendez-Diaz*.[5]

The trial court addressed defense counsel's objection outside of the presence of the jury. During the hearing, the prosecutor marked Court's Exhibits Nos. 16 and 17. Court Exhibit No. 16 was a document from the Kern County Arietis system that showed Sanchez's arrest card was entered into the Arietis system at 10:28 p.m. Court Exhibit No. 17 is a printout from CJIS titled, "Display Booking Detail," that shows Sanchez was booked into the county jail on June 29, 2018, at 11:07 p.m.

The prosecutor asked the trial court to take judicial notice of the date and time Sanchez was arrested and booked. The trial court took the matter under consideration. In the interim, the trial court ruled the documents could be used to refresh Detective Littlefield's recollection.

Detective Littlefield testified that after reviewing Court's Exhibit Nos. 16 and 17, he recalled submitting Sanchez's arrest card at 10:28 p.m., and that he and Detective Davis had transported Sanchez to the county jail around 11:00 p.m. Detective Littlefield added, "and it's annotated [Sanchez] was booked at 11:07 [p.m.]"

Detective Littlefield explained that prior to transporting Sanchez to the county jail for booking, he had to call ahead to notify the jail of Sanchez's status as a peace officer. Between the time of his arrest and the time of booking, Sanchez was being transported from the police department to the county jail. Detective Littlefield estimated the subsequent booking process took approximately 15 minutes.

---

[5] *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*). In *Melendez-Diaz*, Justice Scalia, writing for the majority, held that the petitioner was deprived of his Sixth Amendment right to confrontation when certificates of forensic analysis were admitted into evidence without giving the defendant the opportunity to confront the forensic analysts. The petitioner was charged with distributing and trafficking cocaine and the certificates of analysis related to the composition of the substances seized. (*Id*. at p. 308.)

18.

The prosecutor asked the trial court to mark and admit a certified printout of Court's Exhibit No. 17. The CJIS printout was marked People's Exhibit No. 124 for identification purposes. Defense counsel renewed his *Melendez-Diaz* objection.

Outside of the presence of the jury, the trial court addressed the prosecutor's request for judicial notice. People's Exhibit No. 124 stated Sanchez's bail was set in the amount of $7 million, in addition to information about what time Sanchez's arrest card was submitted and what time he was booked into the jail. Defense counsel stated that if his *Melendez-Diaz* objection were overruled, he would prefer "the Court to just take judicial notice of the CJIS [printout] and not have that document admitted because that could cause wild speculation," even if the bail amount were redacted with a sharpie.

The trial court ruled that People's Exhibit No. 124 was admissible as an official record (Evid. Code, § 1280), without requiring a witness to testify as to the document's identity and method of preparation provided the court took judicial notice of the trustworthiness of the document, or "sufficient independent evidence shows that the record or report was prepared in a trustworthy manner." The trial court added that pursuant to Evidence Code section 664, the statutory presumption that a public official has performed his or her duty may also be used to lay a foundation for an official record.

The trial court granted the People's request to take judicial notice of the time and date of Sanchez's arrest and booking as noted on the certified CJIS printout. The trial court overruled defense counsel's *Melendez-Diaz* objection.

People's Exhibit No. 124 was not moved into evidence. When proceedings resumed before the jury, the jury was not informed that the trial court had taken judicial notice of any facts.

During her closing argument, the prosecutor argued that a third interrogation could not have occurred within the 39-minute timeframe between Sanchez's arrest and when he was booked into county jail. The prosecutor explained the interrogation would have had to have occurred all while Sanchez's arrest information was being entered into the

19.

computer, he was being prepared for transport, the transportation itself, and then the booking procedures, which normally take between 15 to 20 minutes.

**B.     Legal Principles**

Pursuant to Evidence Code section 452, subdivision (h), judicial notice may be taken of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."  The trial court is required to take judicial notice of any matter specified in Evidence Code section 452 if requested to do so by a party, if that party "(a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and [¶] (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter."  (Evid. Code, § 453.)

We review the trial court's ruling on a request for judicial notice for an abuse of discretion.  (*Physicians Committee for Responsible Medicine v. Los Angeles Unified School Dist.* (2019) 43 Cal.App.5th 175, 182.)  " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.  The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' "  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

**C.     Analysis**

Sanchez has failed to demonstrate that the trial court abused its discretion in granting judicial notice of the date and time of his arrest and booking.  Although defense counsel objected to the prosecutor's request to take judicial notice of these facts, defense counsel did not assert the date and time Sanchez was arrested and booked were inaccurately stated on the CJIS printout, nor did he argue this information was reasonably subject to dispute.  Additionally, assuming these facts constitute hearsay, he does not

address the trial court's ruling finding them admissible under the official records exception. (Evid. Code, § 1280.)[6]

Sanchez contends that while the trial court is permitted to take judicial notice of the existence of documents, it is not permitted to take judicial notice of the truth of matters stated therein. For example, "[w]hile a court may take judicial notice of the existence of documents in a court file, it "cannot take judicial notice of the truth of hearsay statements simply because the statements are part of a court record." (*Magnolia Square Homeowners Assn v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1056.)

Here, the trial court specifically took judicial notice of facts stated within the CJIS printout, and not simply the existence of the printout itself. Assuming these undisputed facts constitute hearsay statements, the trial court held this information and the CJIS printout were admissible pursuant Evidence Code section 1280. The trial court's ruling necessarily implies that the foundational elements for the admissibility of the CJIS printout had been met. (Evid. Code, § 402, subd. (c); *People v. Williams* (1997) 16 Cal.4th 153, 196.)

Sanchez never challenged the trial court's ruling finding the date and time of his arrest and booking admissible under Evidence Code section 1280, nor does he explicitly do so on appeal. " 'The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation.' " (*People v. Turner* (2020) 10 Cal.5th 786, 822.) However, "it is the appellant's burden to affirmatively demonstrate error [on appeal]." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As the date and time of Sanchez's arrest and booking were not reasonably subject to dispute, and

---

[6]    It is not clear whether the date and time an arrestee is booked into county jail as stated on the CJIS printout is computer-generated based upon the entry of other information, or whether this information is directly entered into the agency's system by an employee of the Kern County Sheriff's Office. "Only people can make hearsay statements; machines cannot." (*People v. Leon* (2015) 61 Cal.4th 569, 603.) Because the parties appeared to treat this information as hearsay, we do as well.

Sanchez has not shown these facts were hearsay not within an exception, judicial notice of these facts was not an abuse of the trial court's discretion.

Sanchez further contends the date and time of his arrest and booking are "testimonial," and therefore, judicial notice of these facts violated his right to confrontation under the Sixth Amendment. His argument is minimally developed and is not supported by the legal authority he relies upon.

"Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*People v. Sanchez* (2016) 63 Cal.4th 665, 689.) Sanchez does not explain how the date and time that he was arrested and booked into county jail were primarily memorialized for "the purpose of establishing or proving some fact at trial" rather than "having been created for the administration of [the] entity's affairs." (*Melendez-Diaz, supra,* 557 U.S. at p. 324.) In any event, we find his implied assertion unpersuasive as Detective Littlefield's testimony shows these are objective facts which are routinely recorded when a subject is arrested and booked into county jail. (Compare *United States v. Williams* (8th Cir. 2013) 720 F.3d 674, 698-699 [fingerprint cards created as part of a routine booking procedure are nontestimonial]; with *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 696-697 [sworn notices, which memorialized incriminating statements for future criminal prosecutions, are testimonial].)

The fact that this information became relevant at trial does not change the characterization of these facts and the primary purpose for which they were initially recorded. As our Supreme Court has explained in the context of business records, "[s]ome notations in business records may ultimately prove relevant at a trial. But their mere relevance does not make them testimonial. Any number of nontestimonial statements, made in a variety of contexts, may ultimately become relevant in a case.

Indeed, were a statement irrelevant it would be inadmissible regardless of any Sixth Amendment bar." (*People v. Lopez* (2012) 55 Cal.4th 569, 589.)

The error here, if any, by the trial court in granting the prosecutor's request for judicial notice is of a state law statutory dimension. Applying this standard, we conclude Sanchez has failed to demonstrate a "reasonable probab[ility]" that the result of the trial would have been different but for any presumed error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The hearing pertaining to the prosecutor's request for judicial notice occurred outside of the presence of the jury. As a result, the jury never knew that the trial court had taken judicial notice of the date and time of Sanchez's arrest and booking. And, even if the jury was aware of the trial court's ruling, the jury was never instructed to accept as true any facts judicially noticed by the trial court (see Evid. Code, § 457). Upon this record, there is no evidence Sanchez was prejudiced by the trial court's ruling granting the prosecutor's request for judicial notice.

Sanchez observes that Detective Littlefield inadvertently read the time of Sanchez's booking aloud from the court's exhibit while the prosecutor was attempting to refresh his recollection. During his testimony, Detective Littlefield stated "[w]e arrived at the jail around 11:00 p.m., and *it's annotated* [Sanchez] was booked at 11:07 [p.m.]" Thus, according to Sanchez, the contents of the CJIS printout were improperly related to the jury. This issue is distinct from the question of whether judicial notice of facts by the trial court was proper.

A writing being used to refresh a witness's recollection" 'should not be read aloud before the jury.' " (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.) We agree that Detective Littlefield should not have noted what was annotated on the court's exhibit, but we reject Sanchez's assertion that prejudice resulted from his fleeting comment. Further, contrary to Sanchez's assertion, the record does not support the conclusion that the trial court was attempting to mitigate any prejudice from this error by subsequently granting the prosecutor's request for judicial notice.

23.

We further observe Detective Littlefield testified that based upon his recollection, he, Detective Davis, and Sanchez had arrived at the county jail at 11:00 p.m. His testimony, which was clearly proper, narrowed the 39-minute window even further for the third interrogation to have occurred. Consequently, no prejudice resulted from Detective Littlefield's brief statement concerning what was annotated on the court's exhibit.

## III. The Readback of Testimony in Sanchez's Absence Did Not Violate His Constitutional Right to be Present at All Critical Stages of Trial

Sanchez asserts the trial court violated his right to due process under the Fourteenth Amendment by allowing testimony to be read back to the jury in his absence. We disagree.

### A. Background

Shortly after the jury retired to begin deliberations, the foreperson requested a readback of portions of Sanchez's testimony. The following day, defense counsel filed a motion objecting to any readback of testimony occurring in Sanchez's absence.

Outside of the presence of the jury, the parties discussed whether the readback must occur in open court, or whether it may occur in the deliberation room, without the parties present. Defense counsel asserted that the Ninth Circuit held that a readback of testimony in the defendant's absence violates the defendant's right to due process. Defense counsel directed the trial court to several cases, including, *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1358, and *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918.

Relying upon *People v. McCoy* (2005) 133 Cal.App.4th 974 at page 981 (*McCoy*), the trial court overruled defense counsel's objection and denied his request for Sanchez to be present during the readback of testimony. The court reporter read the testimony requested to the jury in the deliberation room.

24.

## B. Analysis

" 'A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by [Penal Code] sections 977 and 1043.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 798-799.) A criminal defendant's federal constitutional right to be personally present at trial encompasses "all critical stages of the criminal prosecution, i.e., 'all stages of the trial where his absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " (*People v. Rodriguez* (1998) 17 Cal.4th 253, 260.)

In *McCoy*, this court observed that the United States Supreme Court "has never held that a readback is a critical stage of trial." (*McCoy, supra*, 133 Cal.App.4th at p. 982.) The California Supreme Court has also repeatedly rejected the argument that a readback of testimony occurring outside the presence of a defendant or counsel constitutes a federal or state constitutional violation. (See, e.g., *People v. Lucas* (2014) 60 Cal.4th 153, 300 ["a readback proceeding is not a critical stage of trial"], disapproved in part by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19; *People v. Butler* (2009) 46 Cal.4th 847, 865 [" '[w]e have repeatedly stated that the rereading of testimony is not a critical stage of the proceedings' "]; *People v. Cox* (2003) 30 Cal.4th 916, 963 [same], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Ayala* (2000) 23 Cal.4th 225, 288 [same]; *People v. Horton* (1995) 11 Cal.4th 1068, 1120-1121 ["a 'defendant is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his or her opportunity to defend the charges against him, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial' "].)

Sanchez urges this court to follow the Ninth Circuit's decision in *Fisher v. Roe*, *supra*, 263 F.3d 906. "Even on federal questions, however, Ninth Circuit cases do not bind the state courts." (*McCoy, supra,* 133 Cal.App.4th at p. 982.) In any event, we are bound to follow decisions by the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We further observe that Sanchez does not explain how he was prejudiced by the readback of testimony in his absence. Rather, he suggests the People cannot surmount the presumption that any error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, because the record does not reveal what, if anything, occurred during the readback in the deliberation room. "Prejudice cannot be presumed on a silent record." (*People v. Medina* (1990) 51 Cal.3d 870, 904.) As the instant case presents no exception to this well-established rule, we find no prejudice assuming error.

## IV. The Trial Court Did Not Abuse its Discretion by Denying Sanchez's Request for a Continuance

Sanchez contends the trial court erred in denying his oral request for a "short" continuance to file a *Pitchess* motion to obtain the personnel records of Sergeant Clayton. We conclude the trial court did not abuse its discretion in denying defense counsel's request for a continuance.

### A. Background

On August 29, 2018, Sanchez testified that three days before the shooting, Lima had threatened the life of Sanchez's brother, a correctional officer at the prison. Sanchez claimed he had reported the threat to his "supervisors." On cross-examination, Sanchez stated he had reported Lima's threat to "a Sergeant," but he would "rather not say [who]." The trial court ordered Sanchez to respond to the prosecutor's inquiry. Sanchez claimed he had reported the threat to "Sergeant Clayton."

Two days later, the prosecutor informed defense counsel and the trial court that she intended to call Sergeant Clayton as a witness in rebuttal.

On September 4, 2018, a hearing was held outside the presence of the jury.  The prosecutor explained Sergeant Clayton was not working in the Investigative Services Unit (ISU) when Sanchez had reported Lima's threat.  Rather, Lieutenant Madden, one of the witnesses who testified at trial, was Sanchez's supervisor in the ISU.  The first time anyone had heard of Sergeant Clayton was during Sanchez's testimony.

Defense counsel requested a continuance so that he could file a *Pitchess* motion to request Sergeant Clayton's personnel records.  Defense counsel claimed he, too, had only learned of Sergeant Clayton's identity and Lima's purported threat when Sanchez had testified.

The trial court offered to permit defense counsel to make a sealed offer of proof concerning the basis for the *Pitchess* motion or the request for a continuance.  Defense counsel replied that he could "make a sealed offer of proof on it, but what I need to do is to run the *Pitchess* motion."  Defense counsel explained there was more than one "Clayton" that worked at Tehachapi State Prison, and assuming the prosecutor "[had] the right Clayton," defense counsel needed a continuance to file a *Pitchess* motion.

Defense counsel stated he had a good faith belief that Sergeant Clayton had a history of complaints filed against him for lying, and " 'he might even be under suspension for failing to follow-up on things like the fight club and other things.' " Defense counsel acknowledged the motion may take 16 days to be calendared, and that he did not "know how long it's going to take for the Department of Corrections to send [him] the materials."  He added, "maybe the … judge hearing the motion will decide that my *Pitchess* declaration is insufficient.  But all of these things will not be known until that motion is heard."

According to defense counsel, he knew of one person who had filed a complaint against Sergeant Clayton "for failing to tell the truth."  Defense counsel stated he would "be able to produce witnesses who will say that [Sergeant Clayton] has had truth

problems; lying in reports and under oath about covering things up, things that were reported to him."

The trial court did not find good cause to support granting defense counsel's request for a continuance or his request to file a *Pitchess* motion. According to the trial court, defense counsel failed to establish "materiality," by showing the requested discovery would support the asserted defense. The trial court further concluded defense counsel's request was "overbroad."

Sergeant Clayton was called as a witness by the prosecution. He testified he had hired Sanchez to work in the ISU in 2016. Sergeant Clayton was transferred from the ISU at the beginning of May 2017, prior to the date Sanchez alleged he had reported Lima's threat to his "supervisors." According to Sergeant Clayton, Sanchez had never reported any kind of threat to him.

In surrebuttal, Sanchez claimed Sergeant Clayton was lying. He did not offer any further details concerning Lima's threat.

### B.      Relevant Legal Principles

"[T]he trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037; § 1050, subd. (e).)  In granting or denying a continuance midtrial, the trial court must consider "the benefit which the moving party anticipates," "the likelihood that such benefit will result, the burden on other witnesses, jurors, and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." (*People v. Hill* (1976) 64 Cal.App.3d 16, 34.)  " ' "A showing of good cause [also] requires a demonstration that counsel *and the defendant* have prepared for trial with due diligence." ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 934, quoting § 1050, subd. (e), italics added.)

"Once a continuance has been denied, the burden is on [the defendant] to establish an abuse of discretion." (*People v. Strozier* (1993) 20 Cal.App.4th 55, 60.)  "In the

28.

absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of his or her motion for a continuance does not require reversal of a conviction." (*People v. Samayoa, supra,* 15 Cal.4th at p. 840.)  "The grant or denial of continuances for discovery purposes is a matter peculiarly within the discretion of the trial court [citation] and defendant must demonstrate some resulting prejudice from the denial of a continuance." (*People v. Jackson* (1980) 28 Cal.3d 264, 307-308, disapproved on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889.)

" 'In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, " 'particularly in the reasons presented to the trial judge at the time the request [was] denied.' " ' " (*People v. Froehlig* (1991) 1 Cal.App.4th 260, 265.)  "The trial court has substantial discretion in ruling on midtrial motions to continue the case, and appellate challenges to a trial court's denial of such a motion are rarely successful." (*People v. Seaton* (2001) 26 Cal.4th 598, 660.)

### C.    Analysis

Sanchez has failed to demonstrate the trial court abused its discretion in denying his request for a continuance to file a *Pitchess* motion.  Sanchez's attempt to establish good cause for his request was inadequate in two respects.  First, even if we assume due diligence were exercised by Sanchez and his defense counsel in seeking Sergeant Clayton's personnel records, Sanchez has not demonstrated a benefit was likely to occur as a result from obtaining the records.[7] (*People v. Sandoval* (1977) 70 Cal.App.3d 73, 83 ["in deciding a [midtrial] continuance motion, '[the court] must consider not only the

---

[7]    Sanchez claimed he acted in fear for his life during a third unrecorded police interrogation.  If true, the significance of Lima's alleged threat, and the likelihood Sergeant Clayton would be called as a witness, should have been apparent to Sanchez well before his trial.  "A showing of good cause requires a demonstration that counsel *and the defendant* have prepared for trial with due diligence." (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1037, italics added.)

benefit which the moving party anticipates but also the likelihood that such benefit will result' "].)  Upon this record, we can only assume Sergeant Clayton's personnel records may have provided a possible benefit.

Defense counsel averred that he could produce witnesses claiming, "[Sergeant Clayton] has truth problems; lying under oath about covering things up, things that were reported to him."  He added, "things have been reported to [Sergeant Clayton] all the time, and he might even be under suspension for failing to follow-up on things like the fight club and other things."  Assuming, *arguendo*, defense counsel's *Pitchess* motion would ultimately have furnished impeachment material bearing upon Sergeant Clayton's credibility, such evidence would have been relevant, but it does not necessarily prove Lima's threat had been made.  At most, it proves Lima's threat *could* have been made.

To this end, defense counsel could have proffered other evidence supporting Sanchez's claim that Lima's threat had occurred, even if defense counsel could not prove the threat had been reported.  Specifically, defense counsel could have proffered the testimony of Sanchez's brother, Gerardo, to whom Sanchez testified he had communicated the threat.  Based upon the fact that Gerardo was not called to testify about Lima's threat, we can only infer that proving the threat had occurred was not critical to Sanchez's credibility or his defense.

Second, Sanchez did not show that a continuance of 30 days was warranted in view of the potential benefit.  Defense counsel did not disagree with the prosecutor's assertion that the *Pitchess* procedure and any investigation thereafter would prolong the murder trial another 30 days.  At this point, the trial was on its eighth week and the parties had rested their respective cases.

Defense counsel did not ask for an order shortening time for filing and service of the motion.  (Code Civ. Proc., § 1005, subd. (b) [moving papers must be served and filed at least 16 days prior to the hearing; Cal. Rules of Court, rule 3.1300(b) [order shortening time].)  He observed the motion takes time to be calendared, that he did not know how

long it would take for the California Department of Corrections and Rehabilitation to send any responsive materials, and that the defense investigator would still have to find and interview potential witnesses. Thus, defense counsel could only offer the prospect of further delay.

Sergeant Clayton's testimony was relevant to Sanchez's claim of self-defense. Lima's threat, if proven, could be considered by the jury in deciding whether Sanchez's conduct or beliefs during the shooting were reasonable. (See CALCRIM No. 3470.) Additionally, Sanchez's credibility was important to his claim of self-defense as there was virtually no independent evidence corroborating Sanchez's version of events. However, we reject Sanchez's suggestion that any impeaching material in Sergeant Clayton's personnel records would have been the lynchpin of his self-defense claim, and that obtaining this prospective evidence should have delayed the murder trial for 30 days.

Sergeant Clayton was not a percipient witness to the shooting. Indeed, his existence was not even known to defense counsel and the prosecutor until Sanchez was ordered to disclose Sergeant Clayton's name during the prosecutor's cross-examination. Insofar as Sergeant Clayton's testimony undermined Sanchez's credibility, he was only one among several witnesses to do so. Sanchez's testimony was directly contradicted by the testimony of Sandra Sanchez, Johnny Romo, Detective Littlefield, Detective Davis, and Sanchez's prior statements to detectives, claiming he did not remember the circumstances immediately preceding the shooting. Additionally, the physical evidence adduced at trial, including, the fact that Lima had been shot 25 times, the majority of which occurred while he was lying in a prone position, painted a picture of a premeditated murder and not a shooting committed in self-defense. Sergeant Clayton's brief testimony aside, Sanchez had substantial hurdles to overcome with respect to his credibility.

In light of the presumed burden of continuing the trial another 30 days upon the jury, and the minimal benefit any impeaching evidence resulting from the *Pitchess*

31.

motion would have yielded, we conclude the trial court did not abuse its discretion in denying defense counsel's request for a continuance. Under the circumstances, we are not persuaded that substantial justice was defeated by the trial court's denial of defense counsel's request for a continuance. (*People v. Samayoa, supra,* 15 Cal.4th at p. 840.)

Recognizing that proving prejudice is a speculative endeavor upon this record, Sanchez suggests that conditional reversal is an appropriate remedy here. According to Sanchez, defense counsel established "good cause" for *Pitchess* discovery, and Sanchez must therefore be given the opportunity to demonstrate prejudice from the denial of his request for discovery upon remand. The remedy of a conditional reversal has been held appropriate in two circumstances. First, where the trial court has failed to make a record of the *Pitchess* materials reviewed in camera. Second, where the trial court has failed to review any documents at all because it erroneously found a lack of good cause to support the motion. (*People v. Gaines* (2009) 46 Cal.4th 172, 180-181.)

Here, defense counsel made a verbal offer of proof concerning the basis for a *Pitchess* motion he intended to file. It is undisputed that a motion was never actually filed because defense counsel needed a continuance to do so. (Evid. Code, § 1043, subds. (a) & (b)(3) [a *Pitchess* motion must be noticed with a supporting affidavit disclosing good cause].) The denial of a request for a continuance midtrial requires the defendant show an abuse of discretion *and resulting prejudice*. (*People v. Samayoa, supra,* 15 Cal.4th at p. 840.) It is through this lens that we examine the trial court's ruling.

For the sake of argument, we will presume any *Pitchess* motion subsequently filed by defense counsel would have been granted, that impeachment material would have been discovered in Sergeant Clayton's personnel records, testifying witnesses would have been secured within a reasonable time, and that these witnesses would have offered credible testimony impeaching Sergeant Clayton's credibility. As discussed, while Sergeant Clayton's testimony and his credibility were relevant to Sanchez's claim of self-defense, it was not decisive. Under the circumstances, Sanchez's inability to present

32.

impeachment evidence against Sergeant Clayton, assuming such evidence existed, did not violate Sanchez's right to due process. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1039 [" 'it is not every denial of a request for more time that violates due process even if the party fails to offer evidence.' "].)

Our conclusion is further supported by the offer of proof made by defense counsel in support of the *Pitchess* motion, which was less than compelling. Defense counsel represented that there were two individuals with the last name Clayton at the prison. If Sanchez identified the prosecutor's witness as the correct Sergeant Clayton, defense counsel stated he had a good faith belief that he would be able to produce witnesses who would testify that he had lied "in reports and under oath about covering things up, things that were reported to him[.]" Defense counsel appeared to change tack when the trial court questioned him about the fact that Sanchez was not sure whether the prosecutor had the right Sergeant Clayton.

Assuming defense counsel's verbal offer of proof was sufficient to establish a "plausible factual foundation" for allegations of officer misconduct (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 85-86), he did not confidently identify which officer was the subject of the alleged prior misconduct. Although a defendant seeking *Pitchess* discovery is not required to " 'allege with particularity the very information he is seeking' " (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 721), at a minimum, defense counsel should have endeavored to discover whether the subject of the alleged prior misconduct and the prosecutor's witness were one in the same. Once Sanchez disclosed Sergeant Clayton's name during cross-examination, the potential relevance of Sergeant Clayton's potential testimony and his credibility should have been immediately apparent to defense counsel. By the time defense counsel made his request for a continuance, there should have been no doubt as to whose personnel records he was seeking to obtain.

Our conclusion that the trial court did not abuse its discretion in denying defense counsel's request for a continuance is not based upon defense counsel's offer of proof. We merely emphasize that a more substantial showing is required where a request for continuance is made midtrial. In sum, we reject defense counsel's assertion that a conditional remand is warranted under the circumstances.

## V.       Cumulative Error

Finally, Sanchez contends that the cumulative effect of the claimed errors was to deny him a fair trial in violation of his constitutional rights. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Sanchez has failed to prove that any of the errors he identifies, individually or collectively, were prejudicial. We are satisfied that he received an overall fair trial.

## DISPOSITION

The judgment is affirmed.

SMITH, J.

WE CONCUR:


POOCHIGIAN, ACTING P.J.


SNAUFFER, J.

34.